**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AUSTIN BUONO, derivatively on behalf of OKTA, INC., <br><br>       Plaintiff, <br><br>    v. <br><br> TODD MCKINNON, BRETT TIGHE, FREDERIC KERREST, SHELLYE ARCHAMBEAU, ROBERT L. DIXON, JR., PATRICK GRADY, BEN HOROWITZ, REBECCA SAEGER, MICHAEL STANKEY, JEFF EPSTEIN, MICHELLE WILSON, CHRISTOPHER KRAMER, JONATHAN RUNYAN and SUSAN ST. LEDGER, <br><br>       Defendants, <br><br>   and <br><br> OKTA, INC., <br><br>       Nominal Defendant. | Case No.: <br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

<u>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**</u>

Austin Buono ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Okta Inc. ("Okta" or the "Company"), files this Shareholder Derivative Complaint against Defendants Todd McKinnon, Frederic Kerrest, Shellye Archambeau, Robert L. Dixon, Jr., Patrick Grady, Ben Horowitz, Rebecca Saeger, Michael Stankey, Jeff Epstein, Michelle Wilson, Christopher Kramer, Jonathan Runyan, and Susan St. Ledger (collectively, the "Individual Defendants") for violations of the Securities Exchange Act and breaches of their fiduciary duties as directors and/or officers of Okta.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based

upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Okta, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, public filings in the related federal securities class action lawsuit action filed in the U.S. District Court for the Northern District of California captioned *City of Miami Fire Fighters' and Police Officers' Retirement Trust v. Okta, Inc., et al.*, No. 3:22-cv-02990-SI   (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.        This is a shareholder derivative action brought in the right, and for the benefit, of Okta against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from September 1, 2021 and September 1, 2022 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Okta and its shareholders, including monetary losses and damages to Okta's reputation and goodwill.

2.        Okta offers cloud-based software that enables businesses to protect and manage user authentication into applications, as well as allows developers to integrate identity controls into software, web services, and devices. Okta Identity Cloud is largely marketed as a one-stop solution for data security for an organization's workforce. To maintain its aggressive expansion plan, in May 2021, Okta acquired Auth0, Inc. ("Auth0"), a long-term competitor.

3.        This complaint arises from Okta representing to investors that the integration with Auth0 following the acquisition was successful, when in fact, Okta experienced significant

issues due to inadequate cyber security controls and, as a result, was vulnerable to data breaches and subsequently experienced a data breach by a hacking group.

4.      Following the acquisition, the Company experienced serious issues with integration, including the loss of senior Auth0 employees and key Okta employees. Retention of key Auth0 employees was critical to the success of the integration. The Individual Defendants, however, withheld this information from shareholders and the public, repeatedly stating that the integration was going as planned.

5.      In January 2022, Okta experienced a security breach because Okta failed to safeguard administrative tools and require its sub-processors to comply with the Company's core security requirements. Hackers were able to infiltrate and access consumer information. Subsequently, hackers touted the security breach on their blog. In response to the hacker's blog post, Defendant McKinnon confirmed that a breach occurred and that the Company had been aware of it since January 2022. On this news, the Company's stock price declined $2.98 per share to close at $166.43 on March 22, 2022 and fell another $17.88 per share, or 10.74%, to close at $148.55 on March 23, 2022.

6.      On August 31, 2022, the Individual Defendants' wrongful conduct came to light when Defendants McKinnon and Tighe announced during an earnings call that the Company was experiencing major challenges with the Auth0 integration and that the Company would reevaluate its growth plans as a result of the integration concerns. On this news, Okta's stock price fell overnight by $22.25 per share, or over 24.3%, to open at $69.15 on September 1, 2022, and fell an additional $8.55 per share on September 1, 2022.

7.      Making matters worse and before investors and the public learned of this crushing news, seven of the Defendants, McKinnon, Tighe, Kerrest, Dixon, Kramer, Runyan, and

St. Ledger (collectively "Insider Trading Defendants"), sold thousands of shares for millions of dollars while in possession of non-public information related to the Company's inadequate cybersecurity controls and vulnerability of security breaches.

8.      As a result of the foregoing, Okta, its chief executive officer, its co-founders, and its chief financial officer have been named defendants in the Securities Action by investors who allege they were damaged when they purchased Okta shares during the Relevant Period.

9.      The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. It will likely cost the Company millions of dollars going forward.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Okta is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Okta, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

14.     Plaintiff is a current shareholder of Okta common stock. Plaintiff has continuously held common stock at all relevant times.

### Nominal Defendant

15.     Defendant Okta is incorporated under the laws of Delaware, with its principal executive offices located 100 First Street, Suite 600, San Francisco, California 94105.  Okta common stock trades on the NASDAQ under the symbol "OKTA."

### Defendants

16.     Defendant Todd McKinnon ("McKinnon") co-founded Okta and has served as the Company's Chief Executive Officer ("CEO") and a member of the Board at all relevant times.

17.     During the Relevant Period, Defendant McKinnon made the following sales of stock:

| Insider Name and Title | Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Todd McKinnon, CEO | 6/16/2022 | 4,005 | $79.97 | $320,293 |

| | | | |
|---|---|---|---|
| | 3/16/2022 | 7,655 | $152.92 | $1,170,624 |
| | 12/20/2021 | 18,363 | $220.19 | $4,043,324 |
| | 12/16/2021 | 4,809 | $214.89 | $1,033,405 |
| | 11/19/2021 | 13,818 | $246.99 | $3,412,850 |
| | 10/20/2021 | 13,818 | $256.75 | $3,547,764 |
| | 9/20/2021 | 18,474 | $253.05 | $4,674,853 |
| | 9/16/2021 | 4,698 | $252.65 | $1,186,933 |
| | **Total Shares Sold** | 85,640 | **Total Proceeds** | $19,390,046 |

18.     Defendant Brett Tighe ("Tighe") Tighe has served as the Company's Chief Financial Officer ("CFO") since January 2022.   Tighe previously served as the Company's interim CFO from June 2021 until his appointment as permanent CFO.

19.     During the Relevant Period, Defendant Tighe made the following sales of stock:

| Insider Name and Title | Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Brett Tighe, CFO | 6/16/2022 | 5,913 | $79.97 | $472,883 |
| | 3/16/2022 | 2,858 | $152.92 | $437,053 |
| | 12/16/2021 | 3,343 | $214.89 | $718,376 |
| | 9/16/2021 | 3,267 | $252.65 | $825,396 |
| | **Total Shares Sold** | 15,381 | **Total Proceeds** | $2,453,708 |

20.     Defendant Frederic Kerrest ("Kerrest") co-founded Okta and has served as the Company's Chief Operating Officer ("COO") and as a member of the Board since July 2009. Kerrest became the Executive Vice Chairperson of the Board in March 2019 and has served in that position throughout the Relevant Period.

21.     During the Relevant Period, Defendant Kerrest made the following sales of stock:

| Insider Name and Title | Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Frederic Kerrest, COO | 6/27/2022 | 300 | $99.14 | $29,743 |
| | 6/16/2022 | 2,535 | $79.97 | $202,733 |
| | 3/16/2022 | 4,825 | $152.92 | $737,853 |
| | 12/17/2021 | 200 | $213.34 | $42,668 |
| | 12/16/2021 | 3,596 | $214.89 | $772,743 |
| | 9/17/2021 | 6,420 | $256.52 | $1,646,837 |
| | 9/16/2021 | 3,514 | $252.65 | $887,799 |
| | 9/2/2021 | 33,228 | $270.61 | $8,991,867 |
| | Total Shares Sold | 54,618 | Total Proceeds | $13,312,243 |

22.     Defendant Shellye Archambeau (Archambeau") has been a director of the Company since 2018. In addition, Defendant Archambeau is a member of the Company's Audit Committee and served as the Chairperson of the Audit Committee until May 2021.

23.     Defendant Robert L. Dixon, Jr. ("Dixon") has been a director of the Company since June 2019. In addition, Defendant Dixon serves on the Compensation Committee.

24.     During the Relevant Period, Defendant Dixon made the following sales of stock:

| Insider Name and Title | Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Robert L. Dixon, Jr., Director | 9/13/2021 | 800 | $263.45 | $210,760 |
| | Total Shares Sold | 800 | Total Proceeds | $210,760 |

25.     Defendant Patrick Grady ("Grady") has been a director of the Company since May 2014. Grady is a member of the Audit Committee.

26.     Defendant Ben Horowitz ("Horowitz") has been a director of the Company since 2010. In addition, Defendant Horowitz serves as Lead Independent director.

27.     Defendant Rebecca Saeger ("Saeger") has been a director of the Company since January 2019. In addition, Defendant Saeger serves on the Compensation Committee and the

Nominating Committee.

28.     Defendant Michael Stankey ("Stankey") has been a director of the Company since December 2016. Defendant Stankey serves on the Nominating Committee and as the Chairperson of the Compensation Committee.

29.     Defendant Jeff Epstein ("Epstein") has served as a director of the Company and as Chairperson of the Audit Committee since May 2021.

30.     Defendant Michelle Wilson ("Wilson") was a director of the Company from August 2015 until April 2022. Wilson served on the Compensation Committee and as Chairperson of the Nominating Committee.

31.     Defendant Christopher Kramer ("Kramer") has been the Company's Chief Accounting Officer ("CAO") since 2014.

32.     During the Relevant Period, Defendant Kramer made the following sales of stock:

| Insider Name and Title | Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Christopher Kramer, CAO | 6/16/2022 | 831 | $79.97 | $66,458 |
| | 3/16/2022 | 1,035 | $152.92 | $158,275 |
| | 12/16/2021 | 991 | $214.89 | $212,956 |
| | 10/14/2021 | 3,335 | $255.61 | $852,443 |
| | 9/15/2021 | 4,301 | $252.62 | $1,086,511 |
| | **Total Shares Sold** | 10,493 | **Total Proceeds** | $2,376,643 |

33.     Defendant Jonathan Runyan ("Runyan") has been the Company's General Counsel since 2015.

34.     During the Relevant Period, Defendant Runyan made the following sales of stock:

| Insider Name and Title | Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Jonathan Runyan, General Counsel | 6/16/2022 | 2,933 | $79.97 | $234,562 |
| | 5/2/2022 | 100 | $118.41 | $11,841 |
| | 3/16/2022 | 2,010 | $152.92 | $307,375 |
| | 12/16/2021 | 1,680 | $214.89 | $361,015 |
| | 10/14/2021 | 18,392 | $260.00 | $4,781,920 |
| | 9/16/2021 | 1,641 | $252.65 | $414,593 |
| | Total Shares Sold | 26,756 | Total Proceeds | $6,111,306 |

35.     Defendant Susan St. Ledger ("St. Ledger") has been the Company's President –
Worldwide Field Operations since 2017.

36.     During the Relevant Period, Defendant St. Ledger made the following sales of
stock:

| Insider Name and Title | Transaction Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Susan St. Ledger, President – Worldwide Field Operations | 6/16/2022 | 2,660 | $79.97 | $212,729 |
| | 3/16/2022 | 5,879 | $152.92 | $899,033 |
| | 9/16/2021 | 26,469 | $252.65 | $6,687,298 |
| | Total Shares Sold | 35,008 | Total Proceeds | $7,799,060 |

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.     By reason of their positions as officers, directors, and/or fiduciaries of Okta and
because of their ability to control the business and corporate affairs of Okta, the Individual
Defendants owed Okta and its shareholders fiduciary obligations of trust, loyalty, good faith, and
due care. The Individual Defendants were and are required to use their utmost ability to control
and manage Okta in a fair, just, honest, and equitable manner. The Individual Defendants were
and are required to act in furtherance of the best interests of Okta and its shareholders to benefit

all shareholders equitably.

38.     Each director and officer of the Company owes Okta and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

39.     As fiduciaries of Okta, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

40.     The officers and directors of Okta were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

41.     Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As Okta's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

42.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices

in the market.

43.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, the United States, and pursuant to Okta's Code of Conduct and internal guidelines;

b)     Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)     Remain informed as to how Okta conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection in addition to that and to take steps to correct such conditions or practices;

d)     Establish and maintain systematic, accurate records and reports of the business and internal affairs of Okta and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Okta's operations would comply with all laws and Okta's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f)      Exercise reasonable control and supervision over Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

g)      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)      Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.     Each of the Individual Defendants further owed Okta and the shareholders the duty of loyalty, which requires that each favor Okta's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45.     At all times relevant hereto, the Individual Defendants were the agents of each other and Okta and were at all times acting within the course and scope of such agency.

46.     The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Okta.

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Okta.

**A.  Okta Code of Conduct**

48.     The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Okta's Code of Business Conduct and Ethics (the "Code

of Conduct"). The Code of Conduct states, in pertinent part, the following:

> Our vision is to accelerate a world where everyone can safely use any technology and safeguarding the identities of our customers' workforces and users is of utmost importance. Trust is at the core of this responsibility, so it follows that acting with integrity and transparency are guiding principles for how we work with each other, our customers, our partners and extended community.

> * * *

> **We maintain financial integrity, and accurate records and accounting**

> The integrity, reliability and accuracy in all material respects of Okta's books, records and financial statements are fundamental to our continued business success. You must accurately and truthfully document each business transaction. You may not cause Okta to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, you may not create any false or artificial documentation or book entry for any transaction entered into by Okta. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets, liabilities and transactions on Okta's books and records. If you are notified that the documents in your possession are relevant to an anticipated or pending litigation, investigation or audit, follow the guidelines set forth in the notification and do not alter or conceal any documents covered by the notification.

> **We comply with applicable laws, rules and regulations**

> We strive to conduct our business in compliance with all applicable laws, rules and regulations in all of the countries in which we conduct business. You may not engage in any unlawful activity in conducting Okta's business or in performing your day-to-day company duties, nor should you instruct others to do so. You are obligated to conduct business ethically and to use good judgment. If you have questions about the legal requirements in a particular country, you should contact the Compliance Officer, or his or her designee, to ensure compliance with local laws and Okta's policies.

> **We safeguard data privacy**

> We make commitments to protect customer data, personal data, confidential information and the systems that process such data. All personnel are expected to follow global privacy laws, secure, access, use and share personal data only in accordance with the law and our policies, and honor individuals' choices with respect to their personal and confidential data. Failure to comply with the law and our policies for confidential and personal data can result in significant liability for us and loss of trust from our customers. Examples of personal data and private communications data may include:

- Individually identifying health information
- Family members' names • Employee ID or government ID number
- Contact information such as email addresses or telephone numbers
- Credit card or personal financial account information
- IP addresses/device IDs
- Customer message detail records
- Customer email communications
- Call or video recordings or transcriptions

For more information, review the training and policies applicable to your situation linked on our Privacy & Product Legal page.

**We communicate appropriately**

Our commitment to building and maintaining a strong reputation and brand means that all information disseminated outside of Okta (for example, to the media, investors or the general public) must be accurate, complete and consistent. To that end, all inquiries from the media and industry analysts must be directed to our Public Relations team, and all inquiries from investors or the investment community must be directed to our Investor Relations team. You should never discuss Okta with the media, investors or analysts unless you have been explicitly authorized to do so by the Public Relations team or the Investor December 2021 Okta Code of Conduct 15 Relations team. You also must obtain approval from your manager and the Public Relations team before accepting any public speaking engagement where you will discuss Okta, its products or services, or your role. Additionally, responses to inquiries from a government agency must be truthful and provide accurate information. Upon receiving this type of request, you must reach out to our Government Affairs team and the Compliance Officer, or his or her designee, before responding. Our Social Media Policy provides more guidance on discussing Okta online. We should be thoughtful in our online communications and ensure that we:

- Do not disclose any confidential information or trade secrets.
- Do not comment on legal matters.
- If discussing the company or Okta products, be transparent about your relationship with the company and be clear that your statements are your own opinion, not those of the company.
- Do not post anything that might be viewed as a threat, harassment or bullying.
- Do not post anything that may be perceived as disrespectful to our customers, clients, suppliers, partners or competitors.

**Administration and waivers**

Our Board of Directors (the "Board") has established the standards in the Code and, directly or through its Audit Committee, oversees its compliance. The Board has delegated day-to-day responsibility for administering and interpreting the Code to

our General Counsel, who is designated as the Code's "Compliance Officer."

It is rare for anyone to be exempted from any part of the Code, regardless of seniority or position. Any waiver of any provision of the Code for a director, executive officer or senior financial officer must be approved by the Board or the Audit Committee, and promptly disclosed as required by applicable law and stock exchange rules. Waivers of the Code for other employees or contractors must be approved by the Compliance Officer, the Board or the Audit Committee. For the avoidance of doubt, manager pre-approval of outside business activities as described in Section 3 does not constitute a waiver under the Code.

Note that the Code is a statement of certain fundamental principles, policies and procedures that govern you in the conduct of Okta's business, and is not intended to and does not create any rights in any employee, customer, client, visitor, supplier, competitor, stockholder, or any other person or entity.

### B. Audit Committee Charter

49.       In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Archambeau, Epstein, and Grady ("Audit Committee Defendants") owed specific additional duties to Okta. The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of its activities to the Board and preparation and certification of the Company's financial statements to guarantee the independent auditors' report, or to guarantee other disclosures by the Company, among other things:

1.  Evaluation and Retention of Auditors. To evaluate the performance of the Auditors, to assess their qualifications (including their internal quality control procedures and any material issues raised by that firm's most recent internal quality control review or any investigations by regulatory authorities) and to determine whether to retain, or to terminate, the engagement of the existing Auditors, or to appoint and engage a different independent registered public accounting firm.

2.   Communication Prior to Engagement. Prior to engagement of any prospective Auditors, to review a written disclosure by the prospective Auditors of all relationships between the prospective Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and to discuss with the prospective Auditors the potential effects of such relationships on the independence of the

prospective Auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence ("Rule 3526"), of the Public Company Accounting Oversight Board (United States) (the "PCAOB"), or any applicable successor rules as may be adopted.

3. Approval of Audit Engagements. To determine and approve engagements of the Auditors, prior to commencement of such engagements, to perform all proposed audit, review and attest services, including the scope of and plans for the audit, the adequacy of staffing, the compensation to be paid, at the Company's expense, to the Auditors and the negotiation and execution, on behalf of the Company, of the Auditors' engagement letters, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members, permitted exceptions and a threshold de minimis amount so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

4. Approval of Non-Audit Services. To determine and approve engagements of the Auditors, prior to commencement of such engagements (unless in compliance with exceptions available under applicable laws and rules related to immaterial aggregate amounts of services), to perform any proposed permissible non-audit services, including the scope of the service and the compensation to be paid therefor, at the Company's expense, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

5. Auditor Independence. At least annually, consistent with Rule 3526, to receive and review written disclosures from the Auditors delineating all relationships between the Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence and a letter from the Auditors affirming their independence, to consider and discuss with the Auditors any potential effects of any such relationships on the independence of the Auditors as well as any compensation or services that could affect the Auditors' objectivity and independence, and to assess and otherwise take appropriate action to oversee the independence of the Auditors.

6. Audited Financial Statement Review. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC following the Public Effective Date and any disclosure from the Company's CEO and CFO to be made in connection with the certification thereof, and to recommend whether or not such financial statements should be so included.

7. Annual Audit Results. To review with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative U.S. GAAP methods on the financial statements), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements, and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

8. Auditor Communications. At least annually, to discuss with the Auditors the matters required to be discussed by Auditing Standard No. 16, Communications with Audit Committees, as amended, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

9. Quarterly Results and Reports on Form 10-Q. To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements and any disclosure from the Company's CEO and CFO to be made in connection with the certification of the Company's quarterly reports filed with the SEC prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB. To review with management and the Auditors, to the extent appropriate, other relevant reports or financial information submitted by the Company to any governmental body or the public, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the Auditors (or summaries thereof).

10. Management's Discussion and Analysis. To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's 6. Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

11. Press Releases. To review with management and the Auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made.

12. Accounting Principles and Policies. To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and

17

practices, alternative accounting policies available under U.S. GAAP related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

13. Risk Assessment and Management. To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to financial risk management and financial risk assessment, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

14. Management Cooperation with Audit. To evaluate the cooperation received by the Auditors during their audit examination, including any significant difficulties encountered during the audit or any restrictions on the scope of their activities or access to required records, data and information and, whether or not resolved, significant disagreements with management and management's response, if any.

15. Management Letters. To review with the Auditors and, if appropriate, management, any "management" or "internal control" letter issued or, to the extent practicable, proposed to be issued by the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

16. Internal Auditors. At least annually: to review and approve Internal Audit's plan for each fiscal year (the "Internal Audit Plan"), and periodically review performance against the Internal Audit Plan for the relevant fiscal year; to review the qualifications, staffing, locations, compensation and performance of the Internal Audit team and reliance upon management and general audit approach and any significant reports prepared by Internal Audit, as well as management's responses; to approve the hiring and dismissal of the head of Internal Audit, to review and recommend changes, as appropriate, to the Internal Audit Charter to ensure that the function has guidelines that allow it to operate effectively; and to ensure that the head of Internal Audit (and those reporting to such individual on Internal Audit matters) has access to the Company's records, cooperation from management and other employees, budget and resources, as necessary to permit the function to operate effectively. To periodically review with the Auditors, the responsibility, budget and staffing of Internal Audit. To discuss, with the Auditors and management, Internal Audit and the extent to which changes or improvements in financial or accounting practices have been implemented. The head of Internal Auditor will report to and be evaluated by the Committee, which may be represented by the chairperson of the Committee.

17. National Office Communications. To review with the Auditors, as appropriate, communications between the audit team and the Auditors' national office with respect to accounting or auditing issues presented by the engagement.

18. Disagreements between Auditors and Management. To review with management and the Auditors, or any other registered public accounting firm engaged to perform review or attest services, any conflicts or disagreements between management and the Auditors, or such other accounting firm, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and to resolve any conflicts or disagreements regarding financial reporting.

19. Internal Control over Financial Reporting; Disclosure Controls. To confer with management and the Auditors, as appropriate, regarding the scope, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including any significant deficiencies and significant changes in internal controls. To obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

20. Separate Sessions. Periodically, to meet in separate executive sessions with the Auditors, the Internal Auditors or other personnel responsible for Internal Audit, as applicable and appropriate, and management to discuss any matters that the Committee, the Auditors, the Internal Auditors or other personnel responsible for Internal Audit or management believe should be discussed privately with the Committee.

21. Correspondence with Regulators. To consider and review with management, the Auditors, outside counsel, as appropriate, and any special counsel, separate accounting firm or other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

22. Complaint Procedures. To adopt procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding (i) accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters, (ii) potential violations of

the U.S. Foreign Corrupt Practices Act or the U.K. Bribery Act or (iii) potential violations of the U.S. federal securities laws, including any rules and regulations.

23. Engagement of Registered Public Accounting Firms. To determine and approve engagements of any registered public accounting firm (in addition to the Auditors), prior to commencement of such engagements, to perform any other review or attest service, including the compensation to be paid, at the Company's expense, to such firm and the negotiation and execution, on behalf of the Company, of such firm's engagement letter, which approval may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee 8. 120009641 v3 members, so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

24. Ethical Compliance. At least annually, to review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws, rules and regulations, as well as to its Code of Conduct, including review and oversight of related party transactions as required by applicable laws or requirements of any stock exchange on which any of the Company's capital stock is listed.

25. Investigations. To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

26. Related Party Transactions. To consider and approve or disapprove any related party transaction as defined under Regulation S-K Item 404, to the extent required by SEC regulations and in accordance with any policy regarding related party transactions as may be adopted by the Board or Committee.

27. Proxy Report. To oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

28. Annual Charter Review. To review and assess the adequacy of this charter annually and recommend any proposed changes to the Board for approval.

29. Report to Board. To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors, the performance of Internal Audit or such other matters as the Committee deems appropriate from time to time or as the Board may request.

30. Internal Control Report. To obtain and review a report by the Auditors describing that firm's internal quality-control review or peer review or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect to one or more independent audits performed by the firm, as well as any steps taken to address the issues raised.

31. Annual Committee Evaluation. To conduct an annual evaluation of the performance of the Committee.

32. Other Legal and Finance Matters. To review, with the Company's counsel, legal compliance and all actual, pending or threatened legal matters that could have a significant impact on the Company's business, prospects or financial statements or as otherwise deemed appropriate by the Committee. To review, with management, the Company's finance function, including its budget, organization and quality of personnel.

33. General Authority. To perform such other functions and to have such powers as may be necessary or appropriate in the discharge of any of the foregoing.

50.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Okta, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, Okta has needlessly expended, and will continue to needlessly expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The purpose and effect of the conspiracy, common enterprise, and/or common

course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

53. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of here because the action described herein occurred under the authority and approval of the Board.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Okta and was at all times acting within the course and scope of such agency.

## FACTUAL BACKGROUND

56.     Okta is an independent data security provider.  The Company's Okta Identity Cloud is an independent and neutral cloud-based identity solution that allows its customers to integrate with nearly any application, service or cloud that they choose through its secure platform and cloud infrastructure. Okta Identity Cloud is used as the central system for an organization's connectivity, access, authentication and identity lifecycle management needs spanning all its users, technology and applications. Its products can be used for both customer identity and workforce identity use cases.

57.     A majority of Okta's income is derived from the sale of multi-year subscriptions for its services. Around 16,000 customers utilize Okta's main product, the Okta Identity Cloud, to secure and manage identities globally. These clients include enterprises, colleges, non-profits, and governmental organizations.

58.     To maintain the rapid growth rates, Okta acquired Auth0. On March 3, 2021, Okta issued a press release announcing that it had entered into a definitive agreement to acquire Auth0 in a stock transaction valued at approximately $6.5 billion. Okta issued a press release quoting Defendant McKinnon that "[c]ombining Auth0's developer-centric identity platform with the Okta Identity Cloud will drive tremendous value for both current and future customers." Customer identity and access management software (also known as "CIAM") from Auth0 allows clients to manage and safeguard external identities, in contrast to Okta's IAM software, which is primarily designed to protect clients' internal, employee information (like customers).

59.     During a March 5, 2021, interview with Jim Cramer on Mad Money, Defendant McKinnon described how the acquisition allowed Okta to accelerate its expansion in the identity market. Defendant McKinnon explained that 75% of Okta's revenue came from the $30 billion

workforce identity market, while only 25% came from the $25 billion customer identity market. McKinnon claimed that the acquisition would enable the business to grow in the consumer identity sector.

60.     Although the acquisition created a substantial growth opportunity for the Company, retention of Auth0 employees was vital to the successful business combination of Okta and Auth0. On May 3, 2021, Okta announced the completion of its acquisition of Auth0. Shortly thereafter, Okta experienced significant integration issues. The Securities Action detailed the accounts of nine employees of Okta and/or Auth0, who are referred to herein as FE1-FE9.

61.     According to FE 1, shortly prior to the acquisition,   Okta promoted   numerous of its employees to higher-ranking positions than their Auth0 counterparts. FE-1 indicated that several senior Auth0 workers were placed in positions with less seniority and responsibility than positions they held, and many other senior Auth0 employees departed the company following the acquisition. The loss of senior Auth0 staff and underutilization of those who remained caused significant integration difficulties.

62.     The loss of senior Auth0 and Okta staff, as well as critical Okta personnel, severely hampered the integration strategy. FE 5 stated that Susan St. Ledger, the President of Worldwide Field Operations at Okta who arrived shortly prior to the acquisition, and Steve Rowland, the Chief Revenue Officer of Okta, "pushed out" the "founding fathers" of Okta and several other employees who helped create the company. FE 5 reported further that as a result of these departures, several directors either terminated or resigned. Employees were replaced with individuals who were inexperienced with Okta's product and CIAM software and products, according to FEs 5 and 6. FE 6 stated following the acquisition, there was a "mass exodus" of salespeople from the Company.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

63.     The Individual Defendants were aware of the Company's integration challenges but suppressed this information from the public. On September 1, 2021, Okta issued a press release which it quoted Defendant McKinnon as saying, "In our first quarter as a combined company with Auth0, we're off to a fantastic start."

64.     During an earnings call held the same day, Defendant McKinnon explained, "It's been less than four months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit. Defendant McKinnon further stated, "when you think about us plus Auth0, it is going very well." During that same call, Defendant McKinnon announced the Company's intention to merge the companies' sales teams, so that all the Company's sales representatives would market and sell Okta and Auth0 products. McKinnon further acknowledged that the sale of Auth0 products would require specialized expertise:

> It's been less than 4 months since we closed the acquisition of Auth0, but we've already made a lot of progress and learned quite a bit. We've made the decision to accelerate the timeline for integrating the sales organizations under Susan St. Ledger's leadership to the beginning of the new fiscal year in February. This move will allow the unified sales team to sell both platforms and benefits customers by providing more options to meet their unique use cases.

> \* \* \*

> And then, plus the integration is -- the sales integration detail planning is starting now. So we have a lot more work to do at the detail level and then budget communication internally and externally on that. At a high level, it's about growth and it's about taking the entire sales capacity of both organizations, combining them together, and making sure that all of that sales capacity, to some degree, can sell all the products: Okta SIEM, Okta Workforce, Auth0 SIEM. There'll be obviously some specialization and some overlays to get the -- to make sure the transition to this unified Salesforce works and that you get the right technical specialization because especially on the – both SIEM products require technical specialization and particularly on the Auth0 side, it's a more developer-facing product, which means it has different kind of technical requirements. So there will be specialization there, but the main high-level idea is more sales capacity, more ability to take this big lead we have in this market. And this market, like I mentioned before, is a $30 billion market, and we're by far the biggest vendor in here, but our ACV is only

like $330 million. So this is a market that's happening before our eyes, and we're going to go capture it, both from the go-to market, from the branding and positioning of us being the premier identity vendor from the execution on how we build the products going forward to make sure we're continuing to advance our respective leads in a separate category -- in the respective categories and subcategories.

65.     During the same call, in response to an analyst's query regarding Company's workplace retention strategies. Defendant McKinnon recognized the importance of employee retention but failed to disclose that the Company had recently lost senior Auth0 critical Okta employees.

66.     On September 14, 2021, during the Piper Sandler Global Technology Conference, Defendant Kerrest addressed the Auth0 integration and knowingly or carelessly omitted to disclose materially relevant information, such as the loss of Okta and Auth0 employees who were critical to the success of the integration:

**[Robbie David Owens Piper Sandler & Co., Research Division]**

Absolutely. Maybe more so on a tactical level, what should investors think about over the next year as it's integrated in? And I think you recently announced sales integration building in some cushion relative to how you're bringing the sales force together. So help us understand just what to look for and potential benchmarks as you move forward with this integration?

**[Jacques Frederic Kerrest Co-Founder, Executive Vice Chairperson & COO]**

Yes, absolutely. So the integration has gone very well. We're about 4 months in. We're pretty good at execution. So we had some pretty good goals for ourselves, but I think we've been beating even those, which is great.

67.     Throughout the Relevant Period, the Company faced major integration challenges. FE 2, who was "intimately involved" in the integration process, the merger was "very, very poorly performed" and a "total nightmare." According to FE 2, the integration strategy entailed keeping Auth0 staff as "specialists" and selling just Auth0 goods for a year while training

Okta employees on those products.  FE 2 recalls the integration plan was "ripped out" at the "eleventh hour."

68.     On December 1, 2021, the Company issued a press release quoting Defendant McKinnon, stating, "We're maintaining the momentum of both Okta and Auth0 and are making great progress on the integration." On the same day, during an earnings call, Defendants Kerrest and McKinnon continued to portray the integration process as smooth and promising, concealing the departure of key personnel from both Auth0 and Okta and the fact that employees from either company were unfamiliar with the other's product.

**[Jacques Frederic Kerrest:]**

Yes. Absolutely. We do have a lot on our plate, and that's an exciting place to be, frankly. And that's the kind of problem we like to have. We are doing very well in the integration efforts. Obviously, when it comes to the back office, that's in really great shape. When it comes to a lot of the upsell, cross-sell motion, we got that figured out very quickly, as we highlighted. And now another key piece of the puzzle, as you just mentioned, is the sales forces. They will be fully integrated come Feb 1, which is 2 short months from now when we kick off the new fiscal year. It'll all be under one umbrella. We're already doing -- as you can imagine, you don't just flip the switch when you have the size of the sales force as ours, especially how fast it's growing. We already are doing a lot of work around territory management, around education, around getting all the new folks ramped on now the broader suite of products that they're going to have to offer. But it's going very well.

* * *

[Todd McKinnon:]

We're in the midst of our strategic and financial planning process right now. And as you mentioned, there's all kinds of things we could do or things people want to do.One thing that's been very clear through the whole thing, the #1 priority by far is executing on the customer identity access management opportunity. So making sure that over the next 12, 18, 24 months, we do an amazing job of winning and expanding our lead in that market. And a big part of that is integrating Auth0, and we're off to a great start. And a big milestone comes, as Freddy mentioned, on Feb 1 when the sales teams are fully integrated. But it's very -- everyone at Okta knows that's the clear priority. We have to execute well on that, and we have to extend our lead in that market. And then that really bodes well for anything else after that we want to do. Winning the SIEM market is going to set the stage for that.

69.     These statements were false and misleading because Individual Defendants failed to disclose the loss of senior Auth0 and key Okta employees and that, as a result, the Company no longer had a team of specialized staff for Auth0 products and could not efficiently integrate. Further, the Individual Defendants withheld the fact that Okta and Auth0 employees were forced to sell each other's products without any knowledge of or experience with those products.

70.     Integration challenges persisted at Okta, as the Company's choice to unite the sales teams without sufficient training was hampered further by the frequent exits of Auth0 employees. FE 5 recalls that "maybe 20%" of sales representatives met their quotas and that there was a "mass exodus" of employees, further characterizing the acquisition of Auth0 as a "shitshow." On March 2, 2022, during the Company's earnings call, an analyst inquired about the unified sales team. Defendants Kerrest and McKinnon continued to minimize the Company's integration challenges despite the sales force's struggle to sell products from both companies and the "mass exodus" of Auth0 personnel.:

[Jacques Frederic Kerrest:]

We are very excited about the integration of Auth0. We're very excited that it's been done in just under a year from where we are because we actually announced the acquisition a year ago tomorrow.

As -- to start with, I think the most important point is the go-to-market organization, which we unified under Susan's leadership on February 1. You heard Todd talk about one team, which I think is a great position to be in. We've put together a lot of the core systems that we're using to run the business. Those are all running on one platform.

So we have one pane of glass and good visibility into all that and how it's working. There's a couple more pieces we need to finish up in terms of ticking and tying some of the systems on the back end, but those are just making sure that we're working as one organization going forward.

71.     During the same earnings call, Defendant McKinnon made similar claims

regarding the integration process:

> What we're getting is we're getting synergy on the -- really on the sales side. So we have -- all of the Okta reps now can sell all the products. So we increased the capacity.
>
> We can -- we increased what they can actually sell. So there's tons of upside from that. But Eugenio has a big job to do with the Auth0 product unit, driving that. They just delivered -- you heard the results.
>
> They delivered over 80% growth, and we expect them to produce a lot in the year ahead.

72.     On June 2, 2022, during Okta's earning call, an analyst questioned Defendant

McKinnon regarding the sales integration process with Auth0:

> **Jonathan Frank Ho William Blair & Company L.L.C.,**
> **Research Division - Technology Analyst**
>
> I just wanted to, I guess, maybe start out with trying to understand, I guess, your sales integration process. How has that gone? And can you give us a sense of maybe some of the incremental opportunities that have come out of that?
>
> **Todd McKinnon Okta, Inc. - Co-Founder, Chairman & CEO**
>
> Yes. Jonathan, it's nice to see you. We just celebrated the 1-year anniversary of joining forces with Auth0, which is great. And as we've said in the past, the key here is keeping the momentum going in both Okta and Auth0. Both businesses were doing very well, and that's the continued focus. We've made a lot of progress as a combined company. Many parts of the back office functions were integrated over the course of FY'22, which is great. And we started Q1 with the combination of go to -- combining the go-to-market organizations. I think there's no real finish line when it comes to integrations. But I think we're really focused on addressing this massive customer identity access management market in a way that, frankly, no other vendor can in terms of independence and neutrality, we have the only 2 modern public cloud solutions and certainly no in-house IT can. So I think we've made great progress. There's still a little bit to do, but we're in good shape.

73.     Similarly, Defendant Tighe highlighted the integration of the sales team

throughout the call.

> And any integration or acquisition and integration of 2 companies, the sales integration is one of the biggest milestones there are. And for this integration between Auth0 and Okta, 2 great sales teams being brought together, it's no

different, right? It was a great milestone for us. It was a big one for us, and we're pleased with the progress, thus far.

74.     Individual Defendants neglected to effectively protect consumer information, despite how critical it was for the Company. FE 6 described the "SuperUser" technology that allowed customer support staff and pre-sale engineers to monitor and manage customer tenants. FE 6 indicated that "tenants" referred to a customer's space under Amazon Web Services and that the SuperUser tool allowed access to any Okta tenant in the world. FE 6 further stated that the sole constraints for the SuperUser were tied to HIPAA compliance for healthcare-associated accounts and referred to conventual commercial accounts as "the wild west."

75.     FE 6 said that while she worked at Okta, SuperUser access was granted at the supervisors' discretion. FE 6 noted that while some of the more experienced managers tended to offer access more cautiously, the newer managers tended to be less circumspect, "hand[ing] it out like candy."

76.     According to FE 6, Okta did not employ precautionary measures with respect to its SuperUser tool. FE 6 explained that normally employees would only have access from a secure administrative station, rather than from their home laptop, because a designated administrative station could be easier to monitor breaches and take corrective action. FE 6 advised that the Company should have used heightened security methods for residential computers, such as providing them with technology that may force an application to shut down or disguise important information if it detected an intruder. FE 6 stated that such precautions are "best practice" in the business and referred to Okta as a "10-year-old startup" that lacked discipline in its security processes.

77.     Moreover, Okta failed to require third parties, such as sub-processors and Solutions Engineers, to follow the Company's own core security criteria. "Zero Trust security

30

throws away the idea that we should have a 'trusted' internal network and an 'untrusted' external network. The adoption of mobile and cloud means that we can no longer have a network perimeter-centric view of security; instead, we need to securely enable access for the various users (employees, partners, contractors, etc.) regardless of their location, device or network." Okta clearly advertises its IAM solutions to its clients to safeguard identity information. However, Okta never required its sub-processors to affirm that they comply with any of these security standards.

78.     On October 13, 2021, Okta issued a press release that quoted Okta's Vice President of Cloud Infrastructure, Atul Bahl, stating:

> As a data-focused organization, security is of the utmost importance to us. Okta's Custom Administrator Roles allow us to follow the principle of least privilege and only grant admins access to the tasks they need to perform across our many business units. We save time for our internal teams and ensure the best-in-class security of our customer applications.

79.     Okta was not adequately securing its administrative tools, and it failed to require its sub processors to follow the Company's own security rules. Due to these deficiencies, on January 21, 2022, hackers known as LAPSUS$ gained access to Okta resources and examined information from the Company's active client tenants after breaching one of the Company's third-party support suppliers, Sykes, a subsidiary of Sitel.

80.     Individual Defendants knew of the January 2022 Breach but delayed disclosing it to the public for another two months and did so only after LAPSUS$ posted evidence on their blog. On March 7, 2022, the Company filed its Form 10-K with the SEC, reporting its financial results for fiscal year 2022 (the "2022 10-K"). The filing was signed by Defendants McKinnon, Tighe, Kerrest, Archambeau, Dixon, Epstein, Grady, Horowitz, Saeger, and Stankey, and it contained highly misleading risk disclosures:

Security is a mission-critical issue for Okta and for our customers. Our approach to security spans day-to-day operational practices from the design and our multi-tenant platform. We ensure that access to our platform is securely delegated across an organization. Okta's source code is updated weekly, and there are audited and verifiable security checkpoints to ensure source code fidelity and continuous security review. We have attained multiple SOC 2 Type II Attestations, SA Star Level 2 Attestation, ISO/IEC 27001:2013, ISO/IEC 27018:2019 and Health Insurance Portability and Accountability Act ("HIPAA") certifications and multiple agency Federal Risk and Authorization Management Program ("FedRAMP") Moderate Authorities to Operate. We also support FIPS 140-2 validated encryption in our Okta Verify MFA product.

Scalability and Uptime

Our technical operations and engineering teams are designed around the concept of an always-on, highly redundant and available platform that we can upgrade without customer disruption. Our products and architecture were built entirely in and for the cloud with availability and scalability at the center of the design and were built to be agnostic with respect to the underlying infrastructure. Our maintenance windows do not require any downtime.

Okta's proprietary cell architecture includes redundant, active-active availability zones with cross-continental disaster recovery centers, real-time database replication and geo-distributed storage. If one of our systems goes down, another is quickly promoted. Our architecture is designed to scale both vertically by increasing the size of the application tiers and horizontally by adding new geo-distributed cells.

The Okta Identity Cloud is monitored not only at the infrastructure level but also at the application and third-party integration level. Synthetic transaction monitoring allows our technical operations team to detect and resolve issues proactively.

* * *

This risk factor summary contains a high-level summary of risks associated with our business. It does not contain all of the information that may be important to you, and you should read this risk factor summary together with the more detailed discussion of risks and uncertainties set forth following this summary A summary of our risks includes, but is not limited to, the following: . . .

- Adverse general economic and market conditions and reductions in workforce identity and customer identity spending may reduce demand for our products, which could harm our revenue, results of operations and cash flows.

- We have experienced rapid growth in recent periods, which makes it difficult to forecast our revenue and evaluate our business and future

prospects.

- Our recent growth rates may not be indicative of our future growth. As our costs increase, we may not be able to generate sufficient revenue to achieve and, if achieved, maintain profitability.

- We have a history of losses, and we expect to incur losses for the foreseeable future.

- If we fail to manage our growth effectively, we may be unable to execute our business plan, maintain high levels of service and customer satisfaction or adequately address competitive challenges. . . .

- Our business depends on our customers renewing their subscriptions and purchasing additional licenses or subscriptions from us. Any material decline in our Dollar-Based Net Retention Rate would harm our future results of operations.

- Customer growth could fall below expectations. We may experience quarterly fluctuations in our results of operations due to a number of factors that make our future results difficult to predict and could cause our results of operations to fall below analyst or investor expectations.

- There are risks related to our ability to successfully integrate Auth0 and realize potential benefits from the acquisition. . . .

- An application, data security or network incident may allow unauthorized access to our systems or data or our customers' data, disable access to our service, harm our reputation, create additional liability and adversely impact our financial results.

- Any actual or perceived failure by us to comply with the privacy or security provisions of our privacy policy, our contracts and/or legal or regulatory requirements could result in proceedings, actions or penalties against us.

* * *

### Risks Related to the Acquisition of Auth0

**The ongoing integration of Auth0 may cause a disruption in our business.**

***The ongoing integration following the acquisition of Auth0 (the"Acquisition") could cause disruptions to our business or business relationships, which could have an adverse impact on results of operations***. Parties with which we have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships

with us. Parties with whom we otherwise may have sought to establish business relationships may seek alternative relationships with third parties.

***The ongoing integration of Auth0 may place a significant burden on our management and internal resources***. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the integration process could adversely affect our financial results.

We have incurred and expect to continue to incur significant costs, expenses and fees for professional services and other transaction costs in connection with the Acquisition. We may also incur unanticipated costs in the integration of Auth0's business with our business. The substantial majority of these costs will be nonrecurring expenses relating to the Acquisition. We also could be subject to litigation related to the Acquisition, which could result in significant costs and expenses.

 ***We may not realize potential benefits from the Acquisition because of difficulties related to integration, the achievement of synergies, and other challenges.***

Prior to the consummation of the Acquisition, we and Auth0 operated independently, and there can be no assurances that our businesses can be combined in a manner that allows for the achievement of substantial benefits. ***The ongoing integration process may require significant time and resources, and we may not be able to manage the process successfully as our ability to acquire and integrate larger or more complex companies, products or technologies in a successful manner is unproven. If we are not able to successfully integrate Auth0's businesses with ours or pursue our customer and product strategy successfully, the anticipated benefits of the Acquisition may not be realized fully or may take longer than expected to be realized. Further, it is possible that there could be a loss of our and/or Auth0's key employees and customers, disruption of either company's or both companies' ongoing businesses or unexpected issues, higher than expected costs and an overall post-completion process that takes longer than originally anticipated.*** Specifically, the following issues, among others, must be addressed in combining Auth0's operations with ours in order to realize the anticipated benefits of the Acquisition:

- combining the companies' corporate functions;

- combining Auth0's business with our business in a manner that permits us to achieve the synergies anticipated to result from the Acquisition, the failure of which would result in the anticipated benefits of the Acquisition not being realized in the timeframe currently anticipated or at all;

- maintaining existing agreements with customers, distributors, providers, talent and vendors and avoiding delays in entering into new agreements with prospective customers, distributors, providers, talent and vendors;

- determining whether and how to address possible differences incorporate cultures and management philosophies;

- integrating the companies' administrative and information technology infrastructure;

- developing products and technology that allow value to be unlocked in the future; and evaluating and forecasting the financial impact of the Acquisition transaction.

*In addition, at times the attention of certain members of our management and resources may be focused on integration of the businesses of the two companies and diverted from day-to-day business operations, which may disrupt our ongoing business and the business of the combined company.*

We may incur significant, non-recurring costs in connection with the Acquisition and integrating the operations of Okta and Auth0, including costs to maintain employee morale and to retain key employees. Management cannot ensure that the elimination of duplicative costs or the realization of other efficiencies will offset the transaction and integration costs in the long term or at all.

## THE TRUTH BEGINS TO EMERGE

81.     On March 21, 2022, LAPSUS$ posted evidence on their blog of the January 2022 Breach. On March 22, 2022 at 4:23 a.m., Defendant McKinnon issued the following statement on his Twitter account:

> In late January 2022, Okta detected an attempt to compromise the account of a third party customer support engineer working for one of our subprocessors. The matter was investigated and contained by the subprocessor. (1 of 2)

> We believe the screenshots shared online are connected to this January event. Based on our investigation to date, there is no evidence of ongoing malicious activity beyond the activity detected in January. (2 of 2)

82.     On this news, Okta's stock price declined $2.98 per share, or 1.76%, to close at $166.43 on March 22, 2022. Later that day, the Company's Chief Security Officer ("CSO"), David Bradbury, published a blog post entitled "Official Okta Statement on LAPSUS$ Claims," revealing that Okta had been aware of the breach since January. In a follow-up post entitled,

"Updated Okta Statement on LAPSUS$," Bradbury revealed that it was "approximately 2.5%" of Okta's customers that had "potentially been impacted and whose data may have been viewed or acted upon."

83.     Following the Company's revised announcement, various news sites began reporting that the January 2022 Breach may have affected hundreds of Okta's clients. For instance, On March 23, 2022, CNN published an article entitled "Okta concedes hundreds of clients could be affected by breach," observing that the Company "has over 15,000 customers, according to its website." As a result of Okta's update after market close, the surrounding media attention, and, the Company's stock price fell $17.88 per share or 10.74%, to close at $148.55 on March 23, 2022.

84.     As a result of the January 2022 Breach, Defendants took steps to repair their reputation, including public apologies for their transgressions, reaching out to hundreds of customers to regain their trust. However, Okta continued to struggle to acquire new customers as a result of the reputational harm created by the January 2022 breach and the Company's delay to report the breach until the hackers publicly disclosed it.

85.     Even though Okta continued to face major challenges with the Auth0 integration and was now losing revenue as a direct consequence of the breach, Individual Defendants informed the public that the Company had maintained customer confidence and was dedicated to reaching its growth objectives. For instance, during an interview with Jim Cramer on June 8, 2022, Defendant McKinnon stated:

> We talked to over 1000 customers face to face over, over video and had these conversations. I personally talked over 400. And got a ton of feedback about what we could do better, how we could make sure that our support environment was not insecure, to make sure that we communicate better, to make sure that we are instill this trust. At the end of the, I think we've been able to do that.

86.      Later, during that same interview, McKinnon continued:

We're committed to making this a $4 billion a year company by fiscal year, fiscal year 26. So, that's, that's coming up quickly. So, we have to invest to grow to that scale and we've always done it with a balance of efficiency. We've always made sure that our, that our growth rate and our [sic] and our cash flow generation was balanced towards that goal. So, we think we're drawing the right balance to capture this market opportunity. And I think over time you're going to see a very highly scaled profitable company that's going to help customers and capitalize on this big market opportunity.

87.      The truth fully emerged on August 31, 2022, when Individual Defendants finally revealed the Company's severe integration issues during an earnings call. During that call, Defendant McKinnon explained that the Company's financial results were "mixed" due to issues related to integration. Defendant McKinnon specifically stated that Okta "experienced heightened attrition within the go-to-market organization, as well as some confusion in the field, both of which have impacted our business momentum." Defendant McKinnon further explained that Okta employees had struggled to sell Auth0 products and vice versa:

Yes, for sure. Thanks for the question. I think there's -- in terms of -- I'll start first with sales organization. The big change on the sales organization was at the beginning of this fiscal year, so Feb 1, and that's where we took the Auth0 sales team that sold as an independent group all through last year for the first three quarters of the – after the acquisition and we combine them together with the Okta sales team. And so, the idea there is that hundreds and hundreds of Okta reps sell the whole portfolio, Okta plus Auth0. And then the Auth0 reps that came over sold the Okta portfolio and Auth0 portfolio. So that was a really significant step in the integration. In terms of -- one thing I want to clarify is that Freddy doesn't manage the sales team.

* * *

I think the headwinds are really about how do you take those hundreds and hundreds of reps and make them productive selling both customer identity cloud and workforce identity cloud, and there's a couple of things that go into that. The first thing is that we really have to reach a new buyer for Okta, which is – Okta traditionally was about CIOs and CISOs. But for customer identity to be successful, we have to reach VPs of technologies, CTOs, all of the chief marketing officers, chief digital officers, the whole suite of C-suite executives that will -- if we win them all and we have an identity platform for all those use cases, we can better

achieve our goal of being the primary cloud and the primary piece of their strategic landscape going forward.

88.      Defendants McKinnon and Tighe also indicated that the Company was reevaluating its fiscal year (FY) 26 objectives, with Tighe adding that the Company would reduce its estimated billings "by approximately $140 million due to the outlook headwinds outlined earlier."

## INSIDER SELLING

89.      Before the integration issues and data breach was fully disclosed by Okta and understood by the market, the Defendants McKinnon, Tighe, Kerrest, Dixon, Kramer, Runyan, and St. Ledger ("Insider Trading Defendants") sold thousands of shares while in possession of material non-public information regarding the Company's business growth and traded at high volume.

90.      Defendant McKinnon sold 85,640 Okta shares, while the price of the Company's stock was artificially inflated for approximately $19,390,046 in proceeds while in possession of material, non-public information. As the co-founder of Okta and CEO, Defendant McKinnon knew the truth about (i) problems with efforts to integrate with Auth0, (ii) inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

91.      Defendant Tighe sold 15,381 Okta shares, while the price of the Company's stock was artificially inflated for approximately $2,453,708 in proceeds while in possession of material, non-public information. As CFO, Defendant Tighe knew the truth about (i) problems with efforts to integrate with Auth0, (ii) inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

92.     Defendant Kerrest sold a total of 54,618 Okta shares, while the price of the Company's stock was artificially inflated for approximately $13,312,243 in proceeds while in possession of material, non-public information. As Founder and Chairman of the Board, Defendant Kerrest knew the truth about (i) problems with efforts to integrate with Auth0, (ii) inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

93.     Defendant Dixon sold 800 Okta shares, while the price of the Company's stock was artificially inflated for approximately $210,760 in proceeds while in possession of material, non-public information. As a director Defendant Dixon knew the truth about (i) problems with efforts to integrate with Auth0, (ii) inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

94.     Defendant Kramer sold 10,493 Okta shares, while the price of the Company's stock was artificially inflated for approximately $2,376,643 in proceeds while in possession of material, non-public information. As CAO, Kramer knew the truth about (i) problems with efforts to integrate with Auth0, (ii) inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

95.     Defendant Runyan sold 26,756 Okta shares, while the price of the Company's stock was artificially inflated for approximately $6,111,306 in proceeds while in possession of material, non-public information. As a General Counsel, Runyan knew the truth about (i) problems with efforts to integrate with Auth0, (ii) inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking

group and traded on such basis.

96.     Defendant St. Ledger sold 35,008 Okta shares, while the price of the Company's stock was artificially inflated for approximately $7,799,060 in proceeds while in possession of material, non-public information. As a President – Worldwide Field Operations, St. Ledger knew the truth about (i) problems with efforts to integrate with Auth0, (ii) inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

## Summary of the Individual Defendants' Wrongful Conduct

97.     The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

98.     The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls and procedures.

99.     The Individual Defendants breached their fiduciary duties to Okta because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch: (i)  to implement internal controls over data security; (ii) and as a result of this inattention, that their cyber controls were susceptible and vulnerable to security breaches; and (iii), failed to report the breach and the public learned of the data breach from the hackers themselves when they posted screenshots of Okta's internal systems in March 2022.

**DAMAGES TO OKTA**

100.     As a direct and proximate result of the Individual Defendants' conduct, Okta will lose and expend many millions of dollars.

101.     Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its chief executive officer, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

102.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

103.     As a direct and proximate result of the Director Defendants' conduct, Okta has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

104.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

105.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

106.     Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

107.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

108.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

109.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

110.    The Company Board is currently comprised of ten members: Defendants McKinnon, Kerrest, Archambeau, Dixon, Grady, Horowitz, Saeger, Stankey, Epstein (collectively, the "Directors"), and non-party Emilie Choi. Thus, Plaintiff is only required to show that a majority of the Defendants, *i.e.*, five, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

111.    Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

112.    Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

113.     Additionally, each of the Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendants McKinnon and Kerrest**

114.     As employees, Defendant McKinnon and Kerrest derive substantially all of their income from their employment with Okta and thus could not disinterestedly consider a demand for action that might require them to sue the directors that control their continued employment and/or fellow members of management with whom they work on a day-to-day basis.

115.     Defendants McKinnon and Kerrest engaged in corporate misconduct by violating Okta's Code of Conduct because they possessed non-public information regarding difficulties integrating  with Auth0, inadequate cyber controls, and severity of the data breach and engaged in self-dealing by trading on such information.

116.     Defendant McKinnon, while in possession of material non-public information, sold 85,640 shares of the Company's stock at various prices per share for a windfall of $19 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.  As a result of his insider selling, Defendant McKinnon may be personally subject to disgorgement.

117.     Defendant Kerrest, while in possession of material non-public information, sold 54,618 shares of the Company's stock at various prices per share for a windfall of $13 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.  As a result of his insider selling, Defendant Kerrest may be personally subject to disgorgement.

118.     Defendants McKinnon and Kerrest are defendants in the Securities Action, which seeks to hold them liable for much of the same wrongdoing as is alleged herein.

119.     Defendants McKinnon and Kerrest worked alongside each other for years at salesforce.com, inc., prior to serving on Okta's Board together. These conflicts of interest and others preclude the current directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

120.     For these reasons, Defendants Kerrest and McKinnon breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

### Defendants Archambeau, Epstein, and Grady

121.     Defendants Archambeau, Epstein, and Grady are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, these Defendants caused these improper statements.

122.     For these reasons, Archambeau, Epstein, and Grady breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendant Dixon**

123.    Defendant Dixon, while in possession of material non-public information, sold 800 shares of the Company's stock at various prices per share for a windfall of $210,760 million, and this sale demonstrates his motive in facilitating and participating in the misleading statements.  As a result of his insider selling, Defendant Dixon may be personally subject to disgorgement, and thus demand upon him is futile and, therefore, excused.

124.    The entire Board oversees managing the Company's operations, including the cybersecurity controls and safeguarding client information. In this regard, the whole Board was aware of or should have been aware of the key facts relating to compliance and operations of the Okta Identity Cloud Platform.

125.    Nine director defendants signed the Company's 2022 10-K, which reported Okta's results for fiscal 2022 and which (as alleged herein and in the Securities Action) contained false and misleading statements.

126.    The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to Okta's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct.  The Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

127.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand for the Directors would be futile.

128.    Okta has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Okta any part of the damages Okta suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

129.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

130.    The acts complained of herein constitute violations of fiduciary duties owed by Okta's officers and directors, and these acts are incapable of ratification.

131.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Okta. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Okta, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

132.   If there is no directors' and officers' liability insurance, then the Directors will not cause Okta to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

133.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### Against the Director Defendants

134.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

135.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

136.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

137.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxy filed with the SEC on May 10, 2022 ("2022 Proxy"). Specifically, the 2022 Proxy Statements falsely stated of failed to disclose  (i) the problems with efforts to integrate with Auth0, (ii) the existence of inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

138.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the 2022 Proxy were materially false and misleading.

139.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2022 Proxy.

140.    Plaintiff has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty**
**Against the Individual Defendants**

141.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

142.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligations of good faith, fair dealing, loyalty, and due care.

143.    Moreover, the Individual Defendants willfully ignored the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

144.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of disclosure, good faith, and loyalty. Specifically, the Individual Defendants made false and misleading statements concerning the Company's business, finances, and relationships, and failed to disclose (i) the problems with efforts to integrate with Auth0, (ii) the existence of inadequate cyber controls; (iii) as a result, Okta was susceptible to data breaches; and (iv) the severity of the data breach caused by the hacking group and traded on such basis.

145.    The Individual Defendants and the Board also breached their fiduciary duties by failing to implement or oversee a system to monitor, among other things, the adequacy of the Company's financial reporting.

146.    The Board failed to establish and/or oversee a reasonable information and reporting system related to the Company's financial reporting.

49

147.    The Individual Defendants also breached their fiduciary duties to Company shareholders by failing to take remedial action against the other Individual Defendants and by concealing the other Individual Defendants' fraudulent statements and material omissions.

148.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Okta has sustained significant damages, as alleged herein.

149.    Plaintiff has no adequate remedy at law.

**COUNT III**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against the Individual Defendants**

150.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

151.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets and engage in the ultra vires and illegal conduct complained of herein.

152.    Plaintiff has no adequate remedy at law.

**COUNT IV**
**Against the Insider Trading Defendants for Breach of Fiduciary Duty**
**Through the Misappropriation of Material, Non-Public Information**

153.    Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

154.    At the time that the Insider Trading Defendants sold their Okta stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

155.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Okta stock.

156.    The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

157.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, any profits made by the Insider Trading Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)    Declaring that the Plaintiff may maintain this action on behalf of Okta, and that Plaintiff is an adequate representative of the Company;

b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Okta;

c)    Determining and awarding to Okta the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve Okta's corporate governance and internal procedures to comply with applicable laws and to protect Okta and its shareholders from a repeat of the damaging events described herein;

e)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f)      Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: April 14, 2023

**DELEEUW LAW LLC**

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw  (#3569)
1301 Walnut Green Road
Wilmington, DE 19807
Phone: (302) 274-2180
brad@deleeuwlaw.com


OF COUNSEL:

**MOORE KUEHN, PLLC**
Justin Kuehn
Fletcher Moore
30 Wall Street, 8th Floor
NY, NY 10005
jkuehn@moorekuehn.com
fmoore@moorekuehn.com


*Attorneys for Plaintiff*